United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Beal Bank USA d/b/a Beal Bank, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-22519-Civ-Scola |
| | ) | |
| Kobi Karp, Defendant | ) | |

## Omnibus Order

This cause is before the Court on the following motions: Defendant's Motion for Leave to Amend Answer and Affirmative Defenses and to Assert Counterclaims (ECF No. 111); Plaintiff's Motion for Summary Judgment and Supplemental Motion for Summary Judgment (ECF No. 110); Defendant's Cross-Motion for Summary Judgment (ECF No. 173); Defendant's Motion to Compel (ECF No. 175); Defendant's Objections to the Order of Magistrate Judge Bandstra (ECF No. 210); and Plaintiff's Motion to Withdraw Demand for Jury Trial and to Strike Defendant's Demand for Jury Trial (ECF No. 224).   Having reviewed the motions, the record, and governing precedent, and for the reasons stated below, the Court enters the following rulings: Defendant's Motion for Leave to Amend Answet (ECF No. 111) is **denied**; the Motions for Summary Judgment (ECF Nos. 110 & 173) are **denied**; Defendant's Motion to Compel (ECF No. 175) is **denied** and his objections (ECF No. 210) **overruled**.  Plaintiff's Motion to Withdraw Demand for Jury Trial and to Strike Defendant's Demand for Jury Trial (ECF No. 224) is **granted**. Defendant's Motion for Hearing (ECF No. 242) is **denied** as moot.

## I.    Introduction And Procedural Background

This case presents a relatively straightforward contract dispute alleging that an individual failed to perform his obligations pursuant to a guaranty he provided for a real estate development loan.  The case is somewhat complicated by the bankruptcy of the borrower of the loan (the real estate developer); the closure of the original lending bank and consequent appointment of the Federal Deposit Insurance Corporation ("FDIC") as receiver with a subsequent sale by the FDIC of a portion of this loan to Plaintiff; a significant dispute as to the value of the real property which secured the loan and whether or not a profitable hotel on the property should have been destroyed; and the death of a co-guarantor who had served as a broker for the loan and allegedly

misrepresented the level of risk involved in order to obtain the Defendant's guaranty, which is the subject of this action.

In early 2006 BankFirst agreed to loan funds totaling $40,630,000 to Beach House Property, LLC ("Beach House"), for a proposed condominium development in Surfside, Florida. Defendant Kobi Karp and his company, Kobi Karp Architecture & Interior Design, "KKAID," were hired as the local architecture firm for the condominium project. The site of the proposed development included an existing and profitable hotel which was demolished in July 2007 in anticipation that the new project would be built.

The loan was secured by two promissory notes. In addition, Karp executed a personal guaranty, which was an unconditional guarantee that he would repay the loan if Beach House, the borrower/developer, failed to satisfy its obligations. On each of two occasions in 2007 when the loan maturity date was extended, Karp signed a consent which reaffirmed his obligations as guarantor.

Despite extensions of the loan maturity date, Bankfirst was not paid by Beach House, and the developer filed for bankruptcy in February 2008. BankFirst then demanded payment from Karp, asserting that Karp was liable as a result of his execution of the guaranty and the consents. After Karp failed to pay the debt, this case was filed by BankFirst in September 2008, pursuant to this Court's diversity jurisdiction, alleging breach of guaranty and seeking a total of $45,816,759.43 in outstanding principal, interest, and fees. Karp filed an answer and affirmative defenses, which have been amended to include twelve affirmative defenses. Karp now has a pending request to again amend his pleading and to add counterclaims for fraud, rescission, fraudulent misrepresentation and gross negligence—alleging, *inter alia*, that BankFirst's representatives misled Karp into believing that there was little risk involved in signing the guaranty and the consents to extend the loan maturity date.

In the course of the Beach House bankruptcy proceedings, the appointed Bankruptcy Trustee was authorized to sell the property, and in June 2009 the then-vacant property was transferred from the debtor pursuant to a $16,000,000 credit-bid offered by an assignee of BankFirst. One month later, BankFirst was closed by regulators, and the FDIC was appointed as receiver. The FDIC then sold a portion of the loan to Beal Bank (specifically, the FDIC sold one of the two promissory notes), and the FDIC entered into a settlement with Defendant Karp as to the remaining portion of the debt (the other promissory note). The Beach House bankruptcy was closed in December 2010. In February 2011, the property was sold to a private buyer for $25,100,000.

After two stays of the litigation before this Court (the first stay in 2009 was to allow the FDIC to conduct its review, and the second stay in 2010 was

to allow the parties to explore settlement) and the parties' own agreement to "stand down" the litigation while pursuing mediation, the parties filed cross-motions for summary judgment.

In this case many of the relevant facts are indisputable; for example, the existence of the loan documents, the FDIC's receivership as to BankFirst, the bankruptcy of Beach House, and the price at which the real property was sold are not in dispute.  The facts which remain in genuine dispute, however, are material and these disputed facts prohibit the Court from entering summary judgment for either party.  Fed. R. Civ. P. 56(a).  To provide context for analysis of the parties' motions for summary judgment and other pending motions, the Court has summarized below all of the relevant facts, whether disputed or indisputable, in chronological order.

Beal Bank objected (ECF No. 221) to the entirety of Karp's "Counter-Statement of Material Facts in Support of his Cross-Motion for Summary Judgment," but the Court has determined that such general objection shall be overruled.  Beal Bank had filed an unusual "Concise Statement" of facts (ECF No. 204), which included facts in support of its own motion for summary judgment and in opposition to Karp's cross-motion for summary judgment.  Karp responded thereto (ECF No. 218), noting correctly that Beal Bank had failed to comply with Local Rule 56.1 of the Southern District of Florida.

Beal Bank also objected (ECF No. 222) to Karp's filing of a "corrected" affidavit of Thomas O'Neill (ECF No. 215), complaining that Beal Bank had no opportunity to respond.  (Karp had attached O'Neill's July 2007 valuation report to the O'Neill Affidavit instead of O'Neill's June 2009 valuation report, and Karp simply sought to correct that error.)  Beal Bank, through the filing of an Affidavit of Scott D. Smith (ECF No. 196-1), already had objected to the submission of O'Neill's Affidavit (ECF No. 166-6), complaining that it omitted O'Neill's June 2009 valuation report.  The Court finds that Karp is entitled to correct that omission; moreover, the omitted item (the June 2009 valuation date) was already in the file. (ECF No. 124-6.)  Beal Bank's objection is, therefore, overruled.

Some of the facts in this Order are taken from Defendant's proposed Third Amended Answer. (ECF No. 111-1.)  Beal Bank objects to the filing of the amended answer as futile.  The Court agrees.  However, the factual allegations in that proposed pleading provide additional relevant factual context for the Court's analysis of the parties' motions for summary judgment and are referenced solely for that purpose in this Order.

## II.    Facts

### A. Kobi Karp and his company agree to work on the Beach House project.

On August 30, 2004, Kobi Karp's company, KKAID, entered into a contract to provide architectural services to the Beach House Property in Surfside, a proposed new condominium and town homes project.  (ECF No. 111-1, Ex. 24; ECF No. 115-6.)  The "Owner" of the property, *i.e.*, the party contracting with KKAID, is identified in this Agreement as Winners LLC, and elsewhere in the record Winners LLC is identified as the owner of a subsidiary named Beach House Property, LLC ("Beach House"). (ECF No. 204, ¶ 1; ECF No. 73-1, p. 8, ¶ 1.)

According to marketing materials dated January 2005, the Beach House project, described as an "ultra high-end condominium project," was going to "provide a substantial profit to equity investors, estimated at a 30% annual return on capital, on an investment horizon planned for 25 months or approx. 2 years." (Confid. Mem., ECF No. 199-1.)   The marketing materials were distributed to banks, potential investors, and others. (ECF No. 204, ¶ 1.)

Not only was Kobi Karp involved as a provider of architectural services, but he also was referred to as a member of an "Enhancement Group" which was to "provide a binding Loan Commitment" to Winners LLC in exchange for a 2% interest in their profits on the project.  (Memorandum of Understanding Regarding Winners LLC, "MOU," ECF No. 114-4, Ex. 17.) The Enhancement Group also included Henry Rodstein, a mortgage broker and an agent of Bankfirst, who was due to receive a commission in addition to the 2% interest in the net profits of Winners LLC.  (*Id.*)  The Enhancement Group was to obtain a binding Loan Commitment, and each member of the Group was to personally guarantee the Loan Commitment.  (*Id.*)

### B. BankFirst (with the help of other participating banks) loans $40,630,000 to Beach House, and Karp guarantees the loan.

At some point the developer was introduced to BankFirst, a bank based in Minnesota, and a subsidiary of Marshall BankFirst Corp. (ECF No. 73-1, ¶ 3.)   On November 30, 2005, BankFirst and Winners LLC entered into a Commitment that required that BankFirst receive acceptable offers from other lenders to participate in "one hundred percent" of the loan.  (ECF No. 114-1, Ex. 14, Section I.12.) According to Karp, by "participating 100% of the loan, Marshall/BankFirst and their network of brokers and appraisers could generate enormous fees without regard to the integrity of the product they were selling." (ECF No. 111-1, p. 11, ¶ 12.) Prior to February 2006, BankFirst had received commitments from several other lenders seeking to participate in the

loan. (ECF No. 111-1, ¶ 41; ECF No. 115-11, Ex. 29.) The loan was to be interest-only and also was designed to include interest reserves. In other words, payments by the borrower (Winners LLC) apparently would not be required until the maturity date.

On February 10, 2006, BankFirst entered into a loan agreement with Beach House for $40,630,000. (ECF No. 1, pp. 11-37, Ex. A.) The proceeds of the loan were to be used, among other purposes, to refinance existing mortgages, finance "pre-development and marketing soft costs," and establish "Loan Interest Reserves" in the amount of $3,656,250. (*Id.* at Section 2.02.)

The Loan Agreement provides for a brokerage fee of as much as $200,000 to be paid to "H.R. Mortgage Corp." (Henry Rodstein's company) and "architectural fees and services" were payable to "Kobi Karp and Associates" in an amount "not to exceed $600,000." (*Id.* at Section 4.03(f).)   Disbursements under the Loan would be made as "Advances" to the borrower (*Id.* at Section 2.01), and BankFirst's commitment to fund the loan was scheduled to expire in December 2006 (*Id.* at Section 1.01(d).) Karp was named as a guarantor, along with Henry Rodstein, and both individuals signed the Loan Agreement.  Karp states that he was not a signator to the Loan Agreement (ECF No. 218, ¶ 4), but his signature appears as a "Guarantor." (ECF No. 1, p. 35.)

In connection with the Loan, Beach House executed two promissory notes in favor of BankFirst: Promissory Note A ("Note A") in the amount of $35,630,000 (ECF No. 1, pp. 39-42, Ex. B) and Promissory Note B ("Note B") in the amount of $5,000,000 (*Id.* at pp. 44-47, Ex. C.) Each of the Notes included a Final Due Date, or "Maturity Date," of December 10, 2006.  While Karp was not a signatory on either Note, he is named as a Guarantor in both Notes.  The second note is no longer at issue, having been settled between Defendant Karp and the FDIC. (ECF Nos. 74 & 90.)

On the same date the Loan was issued, Karp executed a Guaranty guaranteeing the repayment of the Beach House loan in the total principal amount of $40,630,000.  (ECF No. 1, pp. 49-52, Ex. D.)  One week later, BankFirst recorded a mortgage interest in the property. (ECF No. 1-1, pp. 4-48, Ex. I.) Shortly thereafter, BankFirst received confirmation from several lenders agreeing to purchase a participation interest in the Loan, such that BankFirst ultimately only held an 8.42% interest in the Loan, and the remaining 91.58% interest was participated out to 27 other banks (the "Participants"). (ECF No. 111-1, ¶ 44.) BankFirst retained the servicing rights to the Loan and received a fee from each Participant, pursuant to written agreements between each Participant and BankFirst. (*Id.* at ¶¶ 45, 50.)

For example, according to a copy of one of the Participation Agreements, dated February 17, 2006, the Participant, Fairwinds Credit Union, purchased

"an undivided interest in and to the [Loan to Beach House] in an amount equal to Participant's Participation Percentage" (for this Participant, the amount was $6,000,000), and in exchange for the ability to participate in the Loan, Fairwinds Credit Union agreed to a "servicing fee" payable to BankFirst of .25% per annum based on the outstanding principal balance of the Loan. (ECF No. 116-8, pp. 15, 20.)

The Participation Agreements specified that BankFirst "holds for its and Participant's proportional benefit all collateral described in the [Loan documents] securing performance and payment of [Beach House's] and any guarantor's obligations and liabilities" and appoints BankFirst as the agent charged with collecting fees, interest, etc., and distributing those payments to each Participant based on their participation percentage. In the event that the borrower defaulted and an enforcement action was instituted, BankFirst was required to "keep Participant informed as to the progress of the proceedings." BankFirst's rights and obligations were assignable to any entity that acquired the assets of BankFirst.

### C. Karp consents to extension of the Loan Maturity Date and re-affirms his Guaranty.

On March 16, 2007, Karp received a letter from BankFirst, noting that the Loan maturity date had passed, and that BankFirst had "been in negotiations with the Borrower to extend the maturity date." (ECF No. 118-9, Ex. 65.) BankFirst stated that the negotiations had been delayed as a result of Beach House's termination of its relationship with a proposed developer and notes that other defaults, in addition to the maturity date having been exceeded, presently existed under the Loan documents, *e.g.*, failure to replace Rodstein (who had died in November 2006) with a comparable guarantor, failure to maintain insurance coverage, etc. The letter demanded that the Loan be paid in full. (*Id.*)

The loan maturity date subsequently was extended on two occasions, each time by way of an "Amendment to Loan Documents." The First Amendment to Loan Documents was executed by BankFirst and Winners LLC on March 30, 2007. (ECF No. 1, EX. E pp. 54-64.) The Second Amendment to Loan Documents was executed by the same entities on June 21, 2007. (ECF No. 1, pp. 71-78, Ex. G.)

At the time each Amendment was executed, Karp signed a Consent of Guarantor, which "ratifie[d] and reaffirm[ed]" his obligations under the Guaranty. (ECF No. 1, p. 65, Ex. F; ECF No. 1-1, p. 2, Ex. H.) In each Consent, Karp reaffirms that his "obligations under the Guaranties are separate and distinct from Borrower's obligations to Lender." (*Id.*) In the

Consents, Karp "waives and agrees not to assert any anti-deficiency protections or other rights as a defense" to his obligations under the Guaranty, and the terms of the Guaranty itself are incorporated in the Consents signed by Karp. (*Id.*) Notably, both of the Consents were signed after the death of Rodstein.

In addition to the Consents, on March 30, 2007, Karp also executed a document titled "First Amendment to the Memorandum of Understanding." (ECF No. 118-12, Ex. 68.) The original MOU, had provided that Karp and Rodstein, as members of the Enhancement Group, would receive a fee for obtaining construction financing, and that such fee would be 2% of the profits of Winners LLC. (*Id.*) The Amendment to the MOU specified that the fee would be $750,000, with half to be paid to Karp and half to the personal representative of Rodstein's estate. (*Id.*) Karp and the Personal Representative also were to be reimbursed a total of $15,000 for their legal fees in connection with the negotiation of the Amendment. (*Id.*)

It is undisputed that Karp was paid by Winners LLC/Beach House not only for architectural and related services but also for guaranteeing the loan at issue. (ECF No. 218, ¶ 3.) Karp disputes that he was paid money to execute the Guaranty, specifically, but admits that he was compensated for executing the Consents relating to the Guaranty. (*Id.* at ¶¶ 6, 7.) The record reveals that Karp, through payments made to his wife, was paid $125,000 on each of three occasions: April 2, June 28, and December 13, 2007. (ECF No. 111-1, ¶ 90; ECF No. 118-13.) Despite his receipt of such payments, Karp argues that the Guaranty and his Consents are void for two reasons: First, BankFirst should not have relied on Karp as a guarantor (because BankFirst only had evidence of Karp and his wife's joint financial health and not Karp's individual ability to serve as guarantor), and second, Karp was misleadingly advised that there was no risk that he would be responsible for the debt.

### D. Karp claims that BankFirst did not have evidence of Karp's individual financial ability to guarantee the debt.

Karp argues that BankFirst improperly relied on a joint statement of Karp's and his wife's net worth, although only Karp was the guarantor, and that BankFirst did not have sufficient evidence of Karp's ability to serve as a guarantor for this Loan. According to Karp, Rodstein drafted a financial statement and submitted it to BankFirst in November 2005 without Karp's consent. (ECF No. 111-1, ¶ 26.) That statement lists "Kobi & Nancy Karp" as having a net worth of $19,847,185. (ECF No. 116-10, Ex. 37.) In addition, in March 2006, Rodstein allegedly drafted another financial statement, with similar figures, for Karp's approval and submission to BankFirst, in order to satisfy a condition of the Loan (which by that time already had been approved).

(ECF No. 111-1, ¶ 51.) That draft "Current Personal Financial Statement" is included with a memo from Rodstein to Karp dated March 22, 2006 (ECF No. 116-10, Ex. 37.) The statement clearly names Kobi and Nancy Karp, and indicates a total net worth of $20,047,185. (*Id.*) And, finally, the record also includes a "Statement of Financial Condition" dated July 31, 2006, which is titled "Kobi & Nancy Karp" and indicates that the Karps had a total net worth of $20,090,000. (ECF No. 117-10, Ex. 50.) Karp did not object to BankFirst receiving this "Statement of Financial Condition" information, as an employee of KKAID sent the statement to BankFirst by e-mail, with a copy to both Karp and his wife. (*Id.*) Documents in the record indicate that BankFirst considered Karp's net worth and liquidity to be $24 million and $3.1 million, respectively, as of June 2007. (ECF No. 120-7, p. 4, Ex. 97.) Karp asserts that: "[A] June 2007 Current Personal Financial Statement of Karp and his wife, which Karp did not authorize or create, showed a net worth for the ***both*** of them as $24,004,435." (ECF No. 119-14, Ex. 85, ¶112) (emphasis in original).

Karp's argument is that BankFirst never knew Karp's individual net worth and, therefore, BankFirst should not have permitted Karp to serve as a guarantor for the Loan. Notably, Karp's own accountant provided a letter in February 2006 stating that "Kobi & Nancy Karp" had "in excess of $2.1 million in cash deposits." (ECF No. 115-13, Ex. 31.) According to that same accountant, by the following year "Kobi Karp and Kobi Karp Architecture & Interior Design, Inc.," had liquid assets in excess of $3 million. (ECF No. 118-7, Ex. 63.) Thus, it appears that Karp's own accountant did not provide information as to Karp's individual net worth and instead combined his assets with either his wife's assets or his company's assets.

### E. Karp claims that he was fraudulently induced to sign the Guaranty and Consents.

Karp argues that he was induced to execute the Guaranty and Consents by fraudulent statements made by BankFirst, acting through Rodstein as the bank's agent. For example, Karp alleges that he was "advised and assured by Rodstein that Karp would have no exposure with respect to the guaranty because BankFirst had assured that it had secured construction financing for the Project . . . and that at the time of the construction financing the guaranty would be released as the acquisition loan would be repaid." (ECF No. 73-1, ¶ 26, Ex. A.) These purported assurances by Rodstein were made prior to Karp's signing of the Guaranty on February 10, 2006. "Prior to signing the guaranty, I was advised and assured by BankFirst that I would have no exposure with respect to the guaranty because BankFirst was going to provide construction

financing for the Project, and that the construction financing would repay the guaranteed note." (ECF No. 166-5, ¶9.)

Karp complains not only of statements made by Rodstein, but also by Ronald Sweet, First Senior Vice President of BankFirst.  "[D]uring the conference call I had with Rodstein and Ronald Sweet [prior to signing the Guaranty], Ronald Sweet assured me that BankFirst would be providing the construction financing which would pay off the guaranteed loan, and thus I had no real exposure on the guaranty." (*Id.* at ¶ 10.)

After signing the Guaranty, Karp again was told that construction financing was in place.  Karp testified during the Beach House bankruptcy proceedings that Rodstein told him that construction financing already had been obtained from BankFirst. (ECF No. 200-, pp. 52-53.)  And, according to Karp, these misleading statements continued even after Rodstein's death.  "Prior to signing [the second Consent, in June 2007], Ronald Sweet of BankFirst, and Ian Ludmir and Rodrigo Nino of the Borrower [Winners LLC], all assured me that construction financing was then in place through BankFirst." (ECF No. 166-5, ¶ 17.)  Karp testified that he believed that "they were very close to getting" the construction financing, (ECF No. 200-1, p. 41) and that it was only a matter of deciding "which lending institution shall give them the best terms on the project." (*Id.* at p. 43.)  Karp reports that Ronald Sweet told Karp that "the construction financing is in place and that it is just the decision of which lending paperwork; meaning, that the term sheet and everything is in place and they are going to go ahead and provide the financing to Winners, if so they wish, which is the same thing that Winners was telling me, that the financing is in place, just the decision they will make, which lending institution shall give them the best terms on the project." (*Id.*) These conversations took place in approximately July 2007, at the time the hotel was to be demolished. (*Id.* at p. 44.) During his deposition in the bankruptcy proceedings, Karp testified that he attended a meeting in early 2008 with representatives of the developer and potential co-developers where he was told again that construction financing was obtained but the specific lender had not been selected. (ECF No. 2001-1, pp. 20-21, 56-57, 68-69, 75-76.)

### F. The hotel is demolished, the Loan is unpaid, and the developer goes bankrupt.

Karp raises additional factual allegations in support of his claim that the Guaranty and Consents are unenforceable.  For example, Karp argues that BankFirst acted with gross negligence by allowing the hotel, which had been operating profitably, to be demolished before construction financing was in place, and that such negligence by BankFirst should entitle Karp to void the

Guaranty.  Karp claims to have objected to the demolition of the hotel and refers to his wife's message sent by e-mail on May 18, 2007 (after Karp had signed the First Consent but before he signed the Second Consent) to Ronald Sweet remarking that "we cannot have [the hotel] torn down" and asking that Winners LLC be "on notice asap." (ECF No. 166-5, ¶ 15, Ex. 2.)  Mrs. Karp also sent a message by e-mail to Kim Rodstein (Personal Representative of the estate of co-guarantor Rodstein) on May 17, 2007, stating that she had "a problem with winners demoing the property with us still being on the hook b/c if we have to see the property its worth more as an operating hotel than a peice of land.  someone need to put them on notice that they cannot demo until they get a const loan." (ECF No. 117-12, Ex. 52.) (errors in original).   The message is copied to Kobi Karp and Karp's attorney at the time, Steven Goldman.  Despite Mrs. Karp's objections, the hotel was demolished in July 2007.  (*Id.*; ECF No. 73-1, p. 13, ¶ 18.)

When the Loan's Maturity Date, which had been extended to December 10, 2007, arrived, the Loan remained unpaid.  Soon thereafter in early 2008, the developer filed for bankruptcy, pursuant to Chapter 11.  (ECF Nos. 180-189.) The Beach House bankruptcy case was closed December 28, 2010.  (ECF No. 180.) Some of the bankruptcy records reveal that Winners LLC also filed for bankruptcy.  Karp admits that he "did not pay anything under the Guaranty." (ECF No. 218, ¶ 14.)

### G. *BankFirst attempts to enforce the Guaranty and obtain the real property.*

On March 11, 2008, counsel for BankFirst sent a letter to Karp seeking to enforce the Guaranty.  (ECF No. 1-1, pp. 50-51, Ex. J.)  BankFirst also filed a claim in Bankruptcy Court in June 18, 2008, in the amount of $42,879,780.64.  (ECF No. 217-4, Ex. 4.)  The debtor apparently listed Karp or his company as a potential creditor, but no claim was filed or recorded by Karp or his company. (ECF No. 217.)

BankFirst filed this case in September 2008, alleging that Karp breached the Guaranty.  Karp responded with an Answer and Affirmative Defenses, asserting that he had relied on the statements of BankFirst that they would provide a construction loan and that the bank's failure to do so had breached an implied covenant of good faith and barred BankFirst from enforcing the Guaranty.  Karp also argued that any claim should be reduced by the "fair market value of the property which [BankFirst], as a secured lender, has taken steps to effectively foreclose and liquidate upon the assets." (ECF No. 3, p. 10.)

Pursuant to the claim filed by BankFirst in the bankruptcy proceedings, the Bankruptcy Trustee recommended that the property securing the Loan be

sold at auction.  An Order of the Bankruptcy Court entered on May 11, 2009, (ECF No. 188-2) confirmed the Trustee's Second Amended Plan of Liquidation, and the property was sold by auction on June 8, 2009 as a result of a successful credit bid of $16,000,000 made by BankFirst's assignee at the Plan Auction.  The sale was confirmed on June 17. (ECF No. 110-8.)  According to the record, a potential bid in the amount of $24,500,000 was discussed, and the Bankruptcy Court approved the hiring of an attorney to complete the negotiations, but the bidder did not complete the transaction.  (ECF No. 204, ¶ 26.) Although BankFirst's assignee had prevailed at the auction, BankFirst did not promptly record the deed of the property. According to former counsel for BankFirst, although BankFirst was the successful bidder for the property at the Bankruptcy Plan Auction, and title was to be transferred to a then-BankFirst subsidiary, "as luck would have it, the takeover of the bank by the FDIC was on a Friday [and counsel was] going to record the deed [to the property] on Monday [so] the deed did not get recorded."  (ECF No. 84-6, p. 17 of 51.)

### H. BankFirst enters into receivership, and the FDIC sells BankFirst's assets to Beal.

Approximately one month after the confirmation of the sale of the real property at the Bankruptcy Court's auction, BankFirst was closed by banking regulators and the FDIC was appointed as receiver. At the time of BankFirst's failure, BankFirst owned only 8.42% of the subject loan but was also the servicer of the Loan on behalf of the 27 other participating lenders who owned the remaining 91.58% of the Loan. (ECF No. 111-1, ¶ 44.)

Beal Bank agreed to purchase a portion of BankFirst's assets which included the subject Loan.  Pursuant to a Loan Sale Agreement ("LSA") dated July 24, 2009, the FDIC transferred BankFirst's interests in Note A to Beal Bank, and the FDIC retained the interests of BankFirst in Note B. (ECF No. 84-4.)  The transfer included not only the direct ownership interest of 8.42% of the Loan but also the servicing role previously held by BankFirst and then the FDIC. (*Id.*)  "Buyer hereby agrees to assume the role of lead lender for any Loan in which a portion of the Loan was participated to one or more other entities and in which Seller was the lead lender as of the Loan Sale Closing Date. (*Id.*) Buyer hereby agrees to accept any such Participated Loan subject to all participants' right, title and interest in such Participated Loan." (*Id.* at p. 26, ¶ 5.11.) According to the LSA, a "'Participated Loan' means any Loan subject to a shared credit, participation or similar inter-creditor agreement under which [BankFirst] was lead or agent financial depository institution or otherwise managed the credit . . . ." (ECF No. 84-4, p. 13.)

Beal Bank's identification as the "Loan servicer" on behalf of the Participants, (*Id.* at ¶ 5.1) was consistent with the Participants' agreements, and the FDIC provided notice to all Participants on August 19, 2009, that Beal had "acquired servicing rights to Note A . . . ." (ECF No. 123-10, Ex. 133.) Participants were advised that an appraisal of the real property was available for their review, and that real estate taxes were due and if the taxes were not paid, the property "could go to tax sale as early as April 2010." (*Id.*)

The record reveals that Beal Bank and the FDIC did not immediately agree which entity was entitled to record the deed to the real property and which would be responsible for its maintenance costs.  Apparently the FDIC had not immediately agreed that the real property—which already had been disposed of in the Plan Auction—should be included in the sale to Beal Bank. Counsel for Beal Bank explained to the Bankruptcy Court that Beal Bank was the servicing agent for all of the Note A Participants and therefore had a fiduciary obligation to those Participants, in addition to owning an interest in the Loan as one of the Participants.  (ECF No. 84-6, at p. 19 of 51.)  Counsel argued that the property was "probably the only thing that anybody is going to get out of this estate." (*Id.* at p. 20.) An issue arose due to the unpaid real estate taxes owed to Miami-Dade County, and the County's potential offering of the subject property to purchasers of tax certificates.  Beal Bank ultimately paid the taxes, which exceeded $600,000, pursuant to an agreement with the FDIC that Beal Bank would be responsible for such costs.  (ECF No. 84-6, p. 41; ECF No. 204, ¶ 50.)

Finally, in the course of the bankruptcy litigation, the parties reached an agreement that Beal Bank, through an entity it formed for this purpose, CXA-2 Corporation, would receive the deed to the property.  (ECF No. 204 ¶ 45; ECF No. 84-5.)  The Bankruptcy Court confirmed this transfer of title to the property.

The amount that Beal Bank paid for the BankFirst assets is in dispute. Karp asserts that Beal Bank purchased the Loan, or at least BankFirst's interest in Note A, from the FDIC for $374,745, the reported "Repurchase Price" of the Loan as stated in Attachment B to the LSA.  The LSA also reports a "Book Value of Calculation Date (7/17/2009)" as to Note A of $1,245,000.00. (FDIC Sale Agreement, ECF No. 84-4, p. 45.)  According to the FDIC Sale Agreement, the Book Value was the unpaid principal balance, with appropriate adjustments for payments received, etc. Recall that Note A was in the principal amount of $35,630,000, and at the time this case was filed (and presumably, at the time the FDIC took over BankFirst) the principal due under Note A was reported to be $34,484,141.64.  (ECF No. 1, ¶ 26.)  Reducing the Note A value by an amount equal to the credit-bid for the property ($16,000,000), the

resulting principal due under Note A was $18,484,141.64.  BankFirst owned 8.42% of that amount, or $1,556,364.73.  It is unclear what accounts for the difference between the reported Book Value of $1,245,000 and the figure that the Court has calculated.  Beal Bank claims that this is speculation as to the sale price, and that in any event the sale price is irrelevant.

While the Court is unable to determine with certainty from the face of the LSA precisely what price Beal Bank paid for BankFirst's interests in the Loan, other provisions of the LSA are clear, and those provisions clearly restrict Beal Bank's rights with respect to the purchased interests.  The LSA provided, in a section titled "Use of the FDIC's Name and Reservation of Statutory Powers," that:

> Buyer acknowledges and agrees that the assignment of any Loan or Collateral Document pursuant to the terms of this Agreement shall not constitute the assignment of any other rights, powers or privileges granted to Seller pursuant to the provisions the [sic] Federal Deposit Insurance Act, including, without limitation, those granted pursuant to 12 U.S.C. § 1821(d), 12 U.S.C. § 1823(e) and 12 U.S.C. § 1825, all such rights and powers being expressly reserved by Seller; nor, shall Buyer assert or attempt to assert any such right, power or privilege in any pending or future litigation involving any Loan purchased hereunder.

(ECF No. 84-4, p. 28, Section 5.18.) The statutory provisions referenced above are protections available to the FDIC when faced with claims by a private party attempting to prove that a secret or unwritten agreement limits the enforceability of a debt the FDIC acquired from a failed bank.  The buyer, Beal Bank, faced a $25,000 penalty, in addition to payment of actual damages, for any breach of this provision of the LSA.  (*Id.*)  The LSA also provided that Beal Bank "hereby releases and forever discharges Seller, the Failed Bank and the FDIC, . . . from any and all claims . . . that Buyer now has or might have in the future, whether now known or unknown, which are related in any manner whatsoever to the Loans and this Agreement." (*Id.* at ¶ 5.20.)

The property ultimately was sold for $25.1 million, on February 22, 2011, to MB Development, LLC, for cash. (ECF No. 195-1.)  Assuming that Beal Bank paid $374,745 for the assets of BankFirst (which included the Loan and the property) and then sold the property for $25,100,000 in 2011, Beal Bank's 8.4% of the sale price (corresponding with the 8.42% of the loan which was owned directly by BankFirst and transferred to Beal) is $2,113,420.  Deducting the price paid for the assets results in a net recovery to Beal of $1,738,675

(nearly five times what it paid).  It is unclear in the record precisely what recovery was achieved for the 27 Participants in the Loan, who would have at most collectively received 91.58% of the sale price, or $22,986,580, divided proportionally according to their participation percentage.  According to Beal Bank, the sale was completed after an exhaustive marketing effort.  (ECF No. 204, ¶ 47.)

### I.  *The value of the real property securing the Loan*

On the date of the sale of the Beach House property at the bankruptcy auction, June 8, 2009, Beal Bank claims that $40,712,975.33 was due under Note A, of which approximately $34,000,000 was for unpaid principal.  (ECF No. 110-6, ¶ 19, Ex. 2.)  Karp agrees that is the amount of the claim but disputes that he is responsible for any of the amount.  (ECF No. 218, ¶ 50.)  He argues that the sale of the property should have resulted in nothing due and owing under Note A, or any other instrument, as the property had a higher value ($41,000,000) than was stated in BankFirst's credit bid at the Plan Auction.  Beal Bank argues that the proper valuation of the property was only $16,000,000 (the amount of the credit bid), or even less. (ECF No. 110-6.)

The parties have submitted competing appraisals as to the property's value.  As an initial matter, the parties have a dispute as to whether the appraisers accurately assessed the size of the property.  According to Frank Hornstein, one of the appraisers offered in support of Karp's position as to value, the oceanfront parcel contains 74,388 sq ft (1.708 acres) "measured to the [erosion control line] of the Atlantic Ocean, as per the boundary survey." (ECF No. 166-1, p. 3, Ex. A.)

In contrast, Beal Bank relies on the appraised value of the property according to the Miami-Dade County property appraiser's records for each of the relevant years, and an appraisal conducted by James Agner (ECF No. 123-2, ¶ 44; ECF No. 198-1.)  Notably, all of Beal's valuations considered the oceanfront parcel as containing only 45,000 square feet. (ECF Nos. 198-2 & 123-2.)

According to Hornstein, the same appraiser who was hired by BankFirst to appraise the property in 2005, 2007, and 2008, a property owner "is entitled to count every square foot out to the erosion control line in determining what may be built on other parts of the oceanfront property." (ECF No. 217-2, Ex. 2.)  Hornstein notes that the Miami-Dade County Public Records showed the "net measured area" as 45,000 sq. ft. (ECF No. 193-3), but that calculation does not include an area that is properly considered for the purpose of determining fair market value.

The record is replete with numerous conflicting valuations by different appraisers from 2004 to 2011. These valuations reveal that the parties have a genuine dispute as to the material fact of the property's value and what, if any, remains due under the Guaranty and Consents executed by Karp.

## III. Analysis

As an initial matter, the Court must address the question of whether Defendant may amend his answer and affirmative defenses to assert gross negligence and fraud-related counterclaims.

### A. Defendant's Motion for Leave

Defendant already has amended his pleading on three occasions. The original Answer was filed on December 5, 2008 (ECF No. 3); a proposed Amended Answer was submitted on June 12, 2009 (ECF No. 18); a Supplemental Proposed Amended Answer was filed on July 28, 2009 (ECF No. 35); and a Supplemental Proposed Second Amended Answer was filed September 10, 2010 (ECF No. 73) and accepted by this Court on April 6, 2011 (ECF No. 98.) On December 6, 2011, after the parties' unsuccessful attempt at mediation, Defendant filed a motion seeking to amend his pleading yet again, and also seeking—for the first time—to assert counterclaims. (ECF No. 111.)

Amendments to pleadings requested subsequent to a timely initial amendment require the permission of the opposing party or the court. Fed. R. Civ. P. 15(a)(2). Defendant has not obtained the permission of Plaintiff for the filing of the proposed Third Amended Answer and, thus, must obtain this Court's permission in order to amend the pleading. While leave to amend shall be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), amendment is not an automatic right, and leave to amend may be denied when the amendment would be futile. *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 777 n. 10 (11th Cir. 2000).

Defendant's proposed Third Answer sets forth an extensive list of actions or inactions of BankFirst which allegedly misled Karp into signing the Guaranty and Consents, as well as caused the failure of the Beach House development. Karp has, essentially, offered a detailed exemplar of bad banking practices. Karp's Proposed Answer adds 142 paragraphs of Factual Allegations beyond what were already included in his Supplemental Second Amended Answer. The Proposed Answer does not include new affirmative defenses but does add four counterclaims: fraud in the inducement (asserting that Rodstein induced Karp to execute the Guaranty by claiming that there was no risk, and by falsely preparing financials as to Karp and his wife's joint financial health); rescission (Karp claims that he told BankFirst the Guaranty was void and

rescinded based on fraud); fraudulent misrepresentation (similar allegations that Rodstein induced Karp to execute the Guaranty); and gross negligence (alleging that BankFirst failed to perform due diligence and preserve the Loan collateral by allowing the hotel to be demolished, and also that BankFirst had respondeat superior liability as to Rodstein's actions).

The record reveals that all of the conduct of which Karp complains was conducted by BankFirst or its purported agents, *i.e.*, the conduct occurred before BankFirst was closed and the FDIC became the receiver and sold Note A. Beal Bank opposes Karp's request for amendment, arguing that such amendment would be futile in light of Karp's waiver, in the Guaranty, of the ability to challenge the enforceability of the agreement, and also because of the preclusive effect of the *D'Oench* doctrine as to Karp's claims against BankFirst. *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447 (1942). Beal Bank also raises the argument that Karp is precluded from challenging Beal Bank's claim for a deficiency, because the Bankruptcy Plan Disclosure Statement and Plan notes that the debtor and the trustee "believe the value of the property is significantly less that [sic] the amount of BankFirst's secured claim of $40,524,963.81." The Plan states that the lender could assert a claim for deficiency in a future proceeding, but this Court does not construe such statement as a pronouncement that the lender had established the existence of a deficiency. As is clear from the record, Karp did not file a claim in the Bankruptcy Court, and the Court is not inclined to apply *res judicata* in these circumstances. Karp argues that the Court should reject Beal Bank's belated assertion of these arguments (that Karp waived the ability to challenge the Guaranty, and that the *D'Oench* doctrine bars Karp's claims), as Beal Bank failed—as did BankFirst when it was the plaintiff in this case—to raise these arguments earlier.

To determine whether the proposed amendment would be futile (and whether several of the previously raised affirmative defenses can succeed), the Court must first determine the source of relevant precedent. This case was filed by BankFirst to enforce the Guaranty executed by Kobi Karp. Beach House and BankFirst had agreed that Florida law governed their Loan Agreement (ECF No. 1, Ex. A, Section 6.09, p.31), and Karp signed that agreement as a Guarantor. Note A and Note B also state that Florida law governs any attempt to enforce the Notes. The Guaranty executed by Karp provides that he "consents to the personal jurisdiction of the state and federal courts located in the State of Florida in connection with any controversy related to this guaranty or any transaction or matter relating to this guaranty."

Beal Bank, as Plaintiff in this action, seeks to enforce the Guaranty as a result of Beal Bank's purchase of BankFirst's assets (including Note A) from the

FDIC pursuant to the LSA. The LSA provides that the "Federal law of the United States shall control this Agreement [and if] federal law does not supply a rule of decision, this Agreement shall be governed by . . . the laws of the State of New York." (ECF No. 84-4, Section 10.4, p. 36.) A venue provision in the LSA specifies that "any legal action arising under or in connection with the sale, this Agreement or the transactions contemplated hereby are to be instituted in the United States District Court in and for the District of Columbia." (*Id.* at Section 10.9.) A venue provision does not, however, establish what law shall apply—particularly in light of the contracting parties' agreement that federal law or, if necessary, New York state law, applies. Thus, the Court will apply Florida law to determine whether the Guaranty was breached and will apply federal law to questions relating to the LSA.

Beal Bank argues that Karp's claims of fraudulent inducement and gross negligence are barred for at least two reasons: Karp waived any such claims when he signed the unconditional guaranty, and the failure of the lending bank and the role of the FDIC as receiver effectively eliminated Karp's ability to challenge alleged agreements that were not in writing. The waiver contained in the Guaranty is clear, and broad. It states, in pertinent part:

> Guarantor waives all claims, rights and remedies that Guarantor may now have or hereafter acquire against any person or entity at any time now or hereafter liable to payment of any of the indebtedness and as to any collateral security, including but not limited to all claims, rights and remedies of contribution, indemnification, exoneration, reimbursement, recourse and subrogation, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise, whether or not the indebtedness has been fully paid.

(ECF No. 1, Ex. D, pp. 49-52.) In addition, by signing the Guaranty, Karp affirmed that he had conducted his own investigation of Beach House as borrower and "has not relied and will not rely on any information provided by Lender in determining whether to enter into or continue this guaranty." Even if Karp had not signed such a broad waiver, his claims nevertheless might be barred by application of the *D'Oench* doctrine, which derives from a decision of the Supreme Court.

In *D'Oench Duhme & Co., Inc.*, the Supreme Court ruled that a secret agreement not found within a bank's records could not operate as a defense against an action brought by the FDIC. In that case, a securities dealer attempted to prevent the FDIC from enforcing a note executed between the dealer and a failed bank, arguing that the bank had promised the dealer that the note would not be enforced. In *D'Oench,* the secret agreement was in

writing, a receipt given by the bank to the private party, stating that the "note is given with the understanding it will not be called for payment"; the existence of the secret agreement was not disclosed to the FDIC; and the note had been among the charged off assets of the bank. *Id.* at 454. Although the Supreme Court did not rule on this question, it appears that the Court agreed with the lower appellate court that the fact of the note being charged off was not sufficient notice to the FDIC, *i.e.*, the FDIC might have relied on the note when insuring the bank. The Supreme Court held that "in litigation between a bank customer and the FDIC, as successor in interest to a bank, the customer may not rely on agreements outside the documents contained in the bank's records to defeat a claim of the FDIC." *Baumann v. Savers Fed. Sav. & Loan Assoc.*, 934 F.2d 1506, 1514-15 (11th Cir. 1991) (citing *D'Oench*, 315 U.S. at 459).

The purpose of this rule is clear, as it "allow[s] bank examiners to assess accurately the financial condition of the bank." *Id.* at 1515. Alternatively stated, the doctrine "prevent[s] banks and their customers from hiding the true value of a financial institution's assets from government regulators." *Id.* at 1513. As observed by a unanimous Supreme Court, "[t]he harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measures, including termination of the bank's deposit insurance." *Langley v. FDIC*, 484 U.S. 86, 95 (1987).

"The statutory requirements that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of loan terms by bank officials and borrowers (whose interests may well coincide when a bank is about to fail)." *Id.* at 95. "While prudence is not a requirement of normal contract law . . . prudent consideration of the loan is a purpose behind the D'Oench doctrine and Section 1823(e) . . . ." *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 384 (1991). The doctrine is "much more restrictive than ordinary contract interpretation, and . . . flatly prohibits parol evidence." *Id.*

The *D'Oench* doctrine is well-settled in the Eleventh Circuit. The doctrine provides that "a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document," and the doctrine also applies when the FDIC acts as a receiver. *Murphy v. FDIC*, 208 F.3d 959, 963 (11th Cir. 2000). As the appellate court has observed, in *dicta*, the common law doctrine has expanded to protect federal bank insurers and "entities which obtain the assets of the failed bank through purchase and assumption agreements with [FDIC]." *Vernon v. Resolution Trust Corp.*, 907

F.2d 1101, 1106 (11th Cir. 1990) (citing *FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989)).   A successor institution, such as Beal Bank, is entitled to the same protection afforded the FDIC.   *First Union Nat'l Bank of Fla. v. Hall*, 123 F.3d 1374, 1379 (11th Cir. 1997).

In this Circuit, the *D'Oench* doctrine is considered to be broader than the statutory provisions which were enacted after the Supreme Court's decision in *D'Oench* and which parallel the doctrine, 12 U.S.C. § 1823(e).   The statute, adopted initially in 1950 and then amended in 1989 as part of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. No. 101-73 provides that:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . shall be valid against the [FDIC] unless such agreement . . . shall be in writing, was executed by the depository instituti1on and any person claiming an adverse interest thereunder . . . , was approved by the board of directors of the depository institution or its loan committee, . . . [and was] an official record of the depository institution.

12 U.S.C. § 1823(e).   Section 1821(d)(9)(A) provides that "any agreement which does not meet the requirements set forth in Section 1823(e) . . . shall not form the basis of, or substantially compromise, a claim against the [FDIC]."   An agreement that does not meet the provisions of § 1823(e) cannot be enforced even if the FDIC knew of the agreement before it acquired the bank's interest. *Baumann*, 934 F.3d at 1513-14 (citing *Langley v. FDIC*, 484 U.S. 86, 95 (1987)).   Under the statute, courts have protected the FDIC from "secret non-payment agreements, assertions of unwritten arrangements allegedly breached by the bank rendering the debt voidable, and—perhaps most significantly—claims that the creation of the debt was fraudulently induced by the bank." *Vernon*, 907 F.2d at 1105.

However, the enactment of the statute has not diminished the viability of the common law *D'Oench* doctrine, which is alive and well in this Circuit.   As observed by Judge Marcus, "we have emphatically and repeatedly disagreed" with the ruling of the D.C. Circuit (in *Murphy v. FDIC*, 61 F.3d 34 (D.C. Cir. 1995)) as to the continued viability of the *D'Oench* doctrine.   *Murphy v. FDIC*, 208 F.3d 959, 966 (11th Cir. 2000).   *See also Lindley v. FDIC*, 733 F.3d 1043 (11th Cir. 2013) (applying *D'Oench* doctrine and the § 1823(e) test in tandem). Although a few appellate courts have found that the *D'Oench* doctrine was displaced by the statute, the Eleventh Circuit has not agreed.   The adoption of the statute after the announcement of the federal common law doctrine by the Supreme Court, and the failure of Congress to explicitly state that the statute

was intended to displace the existing common law, makes it clear that the doctrine continues to be viable.

Beal Bank asserts that the *D'Oench* doctrine (partially codified at 12 U.S.C. § 1823(e)), bars most of the defenses raised by Karp. Beal Bank specifically does not assert the statutory bar to Karp's claims because the LSA explicitly forbids Beal Bank from raising those defenses. Karp argues that Beal Bank has no right to assert the doctrine as a bar because BankFirst, the then-holder of the mortgage, used its position to credit-bid for the property at the bankruptcy sale, and the debt was satisfied by the actual value of the property. Thus, Karp asserts that there was no deficiency and no claim outstanding under the Guaranty even before the FDIC took over BankFirst and before the FDIC assigned the note to Beal Bank. Under Karp's theory, the debt was satisfied; therefore, the FDIC never acquired an enforceable interest in the Guaranty, and neither the doctrine nor 12 U.S.C. § 1823(e) offer protection, since all of the outstanding indebtedness secured by the note had been resolved and the FDIC essentially had no role. However, the record does not support this argument. When the FDIC became the receiver, it considered that an asset remained in Note A, otherwise it would not have sold the interest to Beal Bank.

It is undisputed that the statements allegedly made to Karp which promised him that he would not face any risk were oral statements and were not recorded in the loan documents or in the Bank's loan committee or board meeting minutes. Accordingly, at least some of the claims Karp brings appear to be barred by the *D'Oench* doctrine of common law. Karp has not established that any of his affirmative defenses, nor counterclaims, constitute an independent or free standing tort such that they might meet one of the exceptions to the *D'Oench* doctrine or § 1823(e). He argues that the gross negligence of the Bank is an independent tort, but this Court disagrees. For example, Karp's claim of fraudulent inducement cannot defeat enforcement, as fraud in the inducement is not relevant to the application of the statute. *See Langley*, 484 U.S. at 93. And by analogy, it is not relevant to application of the doctrine. Karp had the opportunity to seek an amendment of the documents prior to signing the Consents in 2007 and by failing to insist that the written documents were consistent with the oral promises he alleges were made, Karp "lent himself to a scheme or arrangement whereby the banking authority . . . was or was likely to be misled." *Baumann*, 934 F.2d at 1517 (citing *D'Oench*, 315 U.S. at 461). "Congress and the Supreme Court have placed the burden on private parties to document fully the contours of their obligations from the inception of the transaction." *Id.* As in the *Baumann* case, Karp asserts that oral assurances were made to him that "go beyond the scope of the written loan

documents." *Id.* at 1516.  Yet, Karp apparently took no steps to see that those oral assurances were memorialized in writing.  Karp argues that Beal Bank never acquired the right to assert the *D'Oench* doctrine from the FDIC because the FDIC explicitly stated that the LSA did not convey such rights (as codified in 12 U.S.C. §1823(e)) to Beal Bank.  Karp asserts that because the statute should be read as the equivalent of the common law doctrine, the FDIC's prohibition on assertion of the statutory rights also eliminates Beal Bank's ability to assert the common law doctrine as a shield.  Karp further argues that the Agreement is governed by the law of the D.C. Circuit, which has held that the *D'Oench* doctrine has been pre-empted by § 1823(e).  But Karp mistakenly rests his argument on the venue provision in the agreement.  (ECF No. 84-4, § 10.9.)  In opposition, Beal Bank argues—correctly—that the LSA should be governed by the law of the Eleventh Circuit, which recognizes that the common law doctrine exists apart from the statutory provision.

As a novel argument, Karp asserts that the *D'Oench* doctrine only applies to 8.42% of the loan (*i.e.*, the amount owned directly by BankFirst, and then the FDIC, before it was sold to Beal Bank).  However, Beal Bank clearly retained the rights to service the Loan on behalf of the 27 Participants in the Loan.  In fact, Beal Bank became the lead lender when it received the loan from FDIC, with the exclusive right to collect 100% of the indebtedness.  Under this scenario, it seems irrational to only protect 8.42% of the debt from attacks by Karp based on oral statements made by BankFirst, as BankFirst was the only lender in privity with the Borrower as well as with Karp.  While this Court has little experience with participated loans, it appears that such participants in such loans exist in what might be described as a suspended state, waiting on the sidelines for the lead lender to act on behalf of the participants.   The fate of the Participants in this case rises and falls on the conduct of BankFirst as their agent, replaced first by the FDIC, and then by Beal Bank.

In summary, the Court finds that the *D'Oench Duhme* common law doctrine is a bar to Karp's claims of fraudulent inducement and gross negligence.  However, even if the Court did not find that Karp's claims were barred, the merits of Karp's counterclaims are weak.  Karp allegedly relied on Rodstein's statements, but Karp signed the Consents in March 2007 and again in June 2007—months after the death of Rodstein.  Thus, even if this Court were to find that the *D'Oench Duhme* doctrine did not prohibit Karp from bringing the counterclaims and raising the affirmative defense of fraudulent inducement, the Court would find that Karp's claims fail on the merits.  Therefore, the Court **denies** Karp's Motion for Leave to Amend Answer and Affirmative Defenses and to Assert Counterclaims (ECF No. 111.)

**B. *Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment***

The Court now turns to the cross motions for summary judgment. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F. 3d 1109, 1118 (11th Cir. 2013). The moving party bears the initial burden of proof, but having met that burden, the burden then shifts to the party opposing the motion to go beyond the pleadings and designate specific facts showing that there is a genuine issue to be tried. The evidence and all factual inferences that flow from the evidence must be viewed in the light most favorable to the party opposing summary judgment. *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). While the filing of cross motions for summary judgment in some cases reveals that there are no disputes as to material facts, that is not true in this case.

Florida law governs the Guaranty and Consents signed by Karp. Under Florida law, to prevail on a breach of contract claim a plaintiff must establish that there was a valid contract, a material breach, and damages. *Merin Hunter Codman, Inc. v. Wackenhut Corrs. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006). Beal Bank argues that it has established each element of breach and seeks damages in an amount equal to the outstanding loan amount, with an adjustment for the value of the property based on the $16,000,000 credit bid (in the bankruptcy auction) and including other fees and expenses.

Karp disputes that the Guaranty and subsequently executed Consents are enforceable, and has raised twelve affirmative defenses, each of which is addressed here. As discussed above, Karp cannot prevail on his defenses related to secret agreements purporting to eliminate his obligations memorialized in the Loan documents, nor can Karp succeed in his claim that BankFirst's authorization of the demolition of the hotel eliminated Karp's responsibility pursuant to the Guaranty. Therefore, Karp's defenses of estoppel, breach of implied covenants, unclean hands, waiver, breach of fiduciary duty, failure to mitigate damages, impairment of collateral, fraudulent inducement, and lack of consideration must fail. In addition, Karp has argued that the provisions in the Guaranty documents which purport to waive Karp's defenses to enforcement, are inapplicable, but this defense rests on the alleged gross negligence of BankFirst in permitting the hotel to be demolished. As discussed above, this specific argument is unavailing and consequently, so is this affirmative defense.

The essence of the parties' dispute, after resolving all of the issues of enforceability of the Guaranty raised by Karp, is revealed to be: What value of the Beach House property is relevant to determining the outstanding debt at issue and for which Karp is liable? The Guaranty provides that "nothing contained in this guaranty shall deprive Guarantor of any claim, right or remedy, after the indebtedness has been fully paid, against any person or entity other than Borrower." (ECF No. 1, Ex. D, p. 51.) Thus, the Guaranty allows Karp to argue that Beal Bank has been satisfied, or that the "indebtedness has been fully paid."  Karp argues that the fair market value of the property at the time of the auction sale in the bankruptcy proceedings was $41,000,000, according to an Appraisal prepared by Hornstein, who was familiar with the property, having appraised it on several occasions since 2005.

Beal Bank disagrees, and argues that there is a presumption, albeit rebuttable, under Florida law that a foreclosure bid price represents the property's fair market value at that time and that the Plan Auction and credit bid in the bankruptcy proceedings is analogous to a foreclosure bid.  The presumption, however, is rebuttable and is designed to allocate the burden of producing evidence, rather than conclusively establishing value.  *OB/GYN Solutions, L.C. v. Six*, 80 F.3d 452, 456 (11th Cir. 1996). While the credit bid process employed in the bankruptcy proceedings is not precisely the same as a foreclosure proceeding, the Court views the decision in *Six* as important guidance.  Beal Bank asserts that Karp is entitled to a credit only in the amount of the $16,000,000 credit bid, which was made in the bankruptcy proceedings in order to obtain title to the property, and claims that the total amount still due is $30,269,104.34.  However, Beal Bank also appears to concede that a subsequent sale of the property can be evidence of value. (ECF No. 205, at p. 21.)

"The foreclosure sale price does not conclusively establish the value of the property, even if no objection to the sale has been made." *Six*, at 456.  For deficiency judgment purposes, however, Florida law requires a two-step analysis. "[F]irst determining the difference between the outstanding debt and fair market value of the foreclosed property, and second, ascertaining equitable facts that may further reduce the deficiency.  The burden of proving that the foreclosed assets did not satisfy the indebtedness is upon the creditor." *Id.* (denying claim for deficiency, when debtor established that the value of the property was more than $1,900,000, an amount in excess of the mortgage debt of $1,838,196.02, even though the bank only bid $1,200,000 at the judicial sale).

Karp argues that the credit applied to the debt, in recognition that Beal Bank obtained the real property, should be the fair market value at the time of

the sale in June 2009, an amount Karp argues was $41,000,000.  Beal Bank, as creditor, bears the burden of establishing that the foreclosed assets did not satisfy the indebtedness.  *Six*, 80 F.3d at 456.  In support of his argument that the property was worth more than the claimed indebtedness, Karp offers the opinion of the same appraiser who had been hired to perform an appraisal for BankFirst, the original lender.

BankFirst had obtained an appraisal of the property's value by Frank Hornstein as of May 19, 2008, at $41,350,000.  (ECF Nos. 121-5, 202-1.) Hornstein's appraisal at that time referred to the then-existing zoning, and the then-proposed development of a condominium and hotel.  In 2012, Karp contracted with Hornstein to perform another appraisal, determining the property's value as of June 8, 2009. (ECF No. 166-1.)  Hornstein's appraisal found that condominium-hotel construction would not have been financially feasible at that time and instead concluded that hotel buildings would have been the best use of the property and that the value of the property was $41,000,000 as of June 8, 2009.

Beal Bank criticizes that appraisal and offers a review conducted by Scott Smith (ECF No. 204, ¶ 49), which found that the market value in the Hornstein appraisal dated 2012 was misleading and did not accurately reflect the value of the property in June 2009.  Beal Bank instead relies on an appraisal performed by James E. Agner/CBRE, who valued the property at $11,750,000 as of June 8, 2009.  (ECF Nos. 123-2, 198-1.) Karp asserts that the Agner Appraisal is nearly identical to the Miami-Dade County appraised value for the 2009 tax year, of $11,044,744 as of January 1, 2009. (ECF No. 193-3.)  As Karp correctly argues, both the Agner and the County valuations omit nearly half of the east parcel, as both appraisals describe the oceanfront parcel as having only 45,000 square feet (1.03 acres) instead of 74,388 square feet.  According to Hornstein, a property owner "is entitled to count every square foot out to the erosion control line in determining what may be built on other parts of the oceanfront property." (ECF No. 217-2, Ex. 2.)  According to Florida law, title to "all lands landward of [the erosion control line] shall be vested in the riparian upland owners whose lands . . . abut the erosion control line."  Fla. Stat. § 161.191.

The parties' dispute as to the amount of square footage is only one aspect of their dispute as to the value of the property.  The parties also disagree as to the relevant highest and best use.   For example, Beal Bank submitted an appraisal which concluded that the highest and best use was to "hold [the property] for the development" of condominium units. (ECF No. 194-2, p. 9, Ex. A.)  That appraisal determined that the value of the property was $15,500,000. (*Id.* at p. 5.)

The 2012 Hornstein appraisal was for the vacant land in an "as is" condition, as of June 8, 2009, with a highest and best use based on the existing zoning restrictions. The property previously had a hotel, but the hotel was demolished in 2007. The Appraisal indicates that the zoning in effect in June 2009 would have permitted a hotel of 341 total rooms—269 on the east, oceanfront parcel, and 72 rooms on the west parcel. (ECF No. 166-1.) In 2008, Hornstein had appraised the property for use as a hotel/condominium development, which would have allowed 100 rooms and another 87 condominium residences, for a total value of $41,350,000. (ECF Nos. 121-5, 202-1.) At the time of the subsequent appraisal by Hornstein, completed in 2012 with a value effective date of June 8, 2009, market conditions had dramatically changed for the worse and the highest and best use was estimated to be hotel rooms, without condominium units.

In summary, the Court is unable to reconcile the parties' competing appraisals and, as a disputed material fact remains, summary judgment is not appropriate. Therefore the Court **denies** the Motions for Summary Judgment (ECF Nos. 110 & 173).

### C. *Karp's Objection to Magistrate Judge's Order*

In October 2011, shortly after the parties' mediation attempt failed, Karp issued 35 subpoenas to non-parties, which included the 28 Loan Participant entities, and other individuals (representatives of BankFirst or the developer/borrower). (ECF No. 108.) The following month, Beal Bank filed its first motion for summary judgment and shortly thereafter moved for a protective order seeking to have Karp's subpoenas quashed as they had not been issued from a court where the witness was located. Karp then withdrew 32 of the subpoenas which had been issued (some were not withdrawn because they posed no jurisdictional issue) and then re-issued 29 of the subpoenas in other districts. Some subpoenas were neither withdrawn nor re-issued, as the witness was not able to be located. Beal Bank then renewed its motion for protective order. Karp filed a cross-motion to compel responses to the subpoenas and to Karp's Second Request for Production which had been served on Beal Bank.

Magistrate Judge Bandstra granted Beal Bank's motions for protective order, citing two reasons. First, as to the re-issued subpoenas in other Districts, the Judge Bandstra asserted that they were not properly before him. Second, as to the three subpoenas issued within the Southern District of Florida, he found that the parties' cross-motions for summary judgment might eliminate the need for such discovery. He also denied Karp's cross-motion to compel.

Predecessor Judge William Hoeveler had granted Beal Bank additional time to respond to Karp's motion to compel until after the Magistrate Judge entered his ruling.  Karp complains that the Magistrate Judge's Order of June 8, 2012, "failed to address [Karp's] second request [for production served on Plaintiff]."  (ECF No. 210, p. 9.)  As Judge Hoeveler had already granted the Plaintiff's unopposed request to postpone responding to Defendant's second request for production "until after the pending motions for protective order . . . have been ruled on" (ECF No. 161), there was no need for Judge Bandstra to address that request for production.   To the extent that Karp's Motion to Compel a Response to the Second Request for Production (ECF No. 175) remains pending, it is hereby **denied**, without prejudice to renew.  The Court does note, however, that Beal Bank previously argued that the Second Request for Production sought "information largely objectionable." (ECF No. 159.)

Karp also argues that Magistrate Judge Bandstra issued his ruling before Karp filed his timely reply brief as to his cross-motion to compel, but the Court does not find this to be a sufficient ground for vacating the Order.  Instead, the Court agrees with Beal Bank's argument that none of Karp's asserted bases for the discovery are sufficient to justify such extensive discovery requests.  Furthermore, Karp was able to respond adequately to Beal Bank's Motion for Summary Judgment without the need for discovery from the Loan Participants.

As to the determination of whether an attack on the subpoenas might properly be addressed to a court in this District, Beal Bank appears to have no strongly held view, nor does this Court need to reach that issue at this time, other than to observe that an answer may be found in Federal Rules of Civil Procedure 26(c)(1) or Rule 45(d).   In summary, the Court **overrules** Karp's objections (ECF No. 210) and **affirms** Magistrate Judge's Order (ECF No. 206.)

### D. *Plaintiff's Motion to Withdraw Demand for Jury Trial and to Strike Defendant's Demand for Jury Trial*

The constitutional right to a jury trial in a civil case is expressly protected by the Seventh Amendment to the United States Constitution, but that right may be waived as long as such waiver is knowingly and voluntarily made.  When this case was filed in late 2008, Plaintiff BankFirst demanded a jury trial—indeed, the pleading is styled "Complaint for Breach of Guaranty and Demand for Jury Trial."  (ECF No. 1.)  Karp also sought a jury trial when filing his original Answer and Affirmative Defenses and in each of his amendments thereto.  Beal Bank, a party in this case as of December 2009, did not object to the requested jury trial until September 2012, when it filed this motion to withdraw the demand and strike Karp's demand. While Beal Bank correctly argues that this case had a lengthy period during which little

litigation activity occurred, it is nevertheless true that a delay of three years might be sufficient to demonstrate a waiver of the ability to now contest the request for a jury trial.

Beal Bank relies on the very document on which this lawsuit is based—the Guaranty executed by Karp which explicitly waives the right to a jury trial. While Beal Bank was not the original Lender at the time Karp signed the Guaranty, there is no dispute that Beal Bank can invoke the jury trial waiver contained therein, as Beal Bank is the successor or assignee of the original Lender and the Guaranty expressly provides that it shall benefit "Lender, its successors and assigns."   Regardless of which party in this case has the burden of proving that the waiver was knowing and voluntary, the Court finds that both Karp and BankFirst (now Beal Bank) waived their rights to a jury trial.  According to the Guaranty, in a section titled "Waiver of Trial by Jury":

> Guarantor and Lender  . . .  each knowingly, voluntarily and intentionally waive any right to a trial by jury in any claim, controversy, dispute, action or proceeding arising out of or related to this guaranty . . . and agree that any such action or proceeding shall be tried before a court and not before a jury.  Guarantor and Lender acknowledge that this waiver is a material inducement to enter into a business relationship, that each of them have relied on this waiver in entering into this agreement . . . and that each of them will continue to rely on this waiver in their related future dealings.  Guarantor and Lender warrant and represent that each had the opportunity of reviewing this jury waiver with legal counsel, and that each knowingly and voluntarily waives its jury trial rights.

(ECF No. 1, Ex. D, pp. 49-52.)  The waiver provision, which is entirely in capital letters, appears in the Guaranty directly above the signature line where Karp's signature is found.   "It is hard to conceive of a waiver provision more conspicuous."  *Hamilton v. Sheridan Healthcorp, Inc.*, No. 13-62008, 2014 WL 537343, (S.D. Fla. Feb. 11, 2014) (Cohn, J.) (holding that a medical doctor was sufficiently sophisticated to have waived his right to a jury trial where conspicuous waiver provision in all capital letters appeared above the doctor's signature).

Karp objects to Beal Bank's attempt to withdraw the jury demand, citing Fed. R. Civ. P. 38(d): "A proper demand [for a jury trial] may be withdrawn only if the parties consent."  Karp's argument is unavailing, however, as it presumes a proper demand was made.  "On any issue *triable of right* by a jury, a party may demand a jury trial . . . ."  Fed. R. Civ. P. 38(b) (emphasis added).  Even after such demand has been made, the Court may, "on motion or on its own, find[ ] that on some or all of those issues there is no federal right to a jury

trial." Fed. R. Civ. P. 39(a)(2).  Karp cites *Wendy's of Bowling Green, Inc. v. Marsh USA, Inc.,* No. 3-10-1043, 2012 WL 370486 (M.D. TN. Feb. 3, 2012), but that case simply applies Rule 38(d) without analysis and holds that the defendant may not withdraw its request for a jury without plaintiff's consent (both parties had requested a jury, and defendant later argued that the parties had contractually waived that right).  Similarly, Karp's citation to *Coleman v. Lazy Days RV Center, Inc.*, 05-civ-930-T-17TBM, 2007 WL 2696789 (M.D. Fla. Sept. 12, 2007) is as unhelpful as *Wendy's.*  Without citation to authority, the case holds that a defendant, which had waited more than two years to challenge plaintiff's demand for a jury trial and had agreed to a jury trial in a Case Management Report, was unable to successfully argue for a bench trial. *Id.*

Beal Bank urges the Court to enforce the mutual waiver of jury trial found in the Guaranty and also argues that Karp has failed to demonstrate that he will be prejudiced by having this case tried by the Court instead of a jury.  The Guaranty expressly states that the waiver was a "material inducement" to enter into the business relationship.  In *Acciard v. Whitney*, No. 07-cv-00476, 2011 WL 4902972 (M.D. Fla. Oct. 13, 2011), the court noted that Fed. R. Civ. P. 39(a)(2) contains no time limit for the filing of an objection to the demand for a jury trial.  In that case, the counter-claimant waited approximately ten months to object to the counter-defendant's assertion of a jury trial right.  Although the same court previously had denied the defendant's motion to strike plaintiff's jury demand, finding that defendant had delayed too long to enforce the waiver provision in the parties' mortgage agreement, the court noted that the case posture had changed and that the remaining issues to be tried could be tried by the court, in order to conserve judicial resources. *Id.* at *4.  The court also noted that the counter-defendants had failed to demonstrate why a bench trial would be prejudicial to their interests.  *Id.*

While there is support for both arguments, the Court concludes that the proper course is to conduct a bench trial.  Both Karp and BankFirst agreed to waive the right to a jury trial.  This mutual agreement benefitted both of those contracting parties, and Beal Bank is bound by that agreement, as Beal is the successor to BankFirst's interests.  Moreover, Karp has not demonstrated how he will be prejudiced by this case being tried to the court.  The facts of this case are unusual; specifically, both sides of this dispute had waived a jury trial right and then demanded a jury trial apparently without regard to their prior contractual agreement.  As such, the Court's ruling today should not be viewed as a general holding that a party can delay in bringing its request to withdraw its own demand for a jury trial.  In light of the above, the Court **grants** Beal

Bank's Motion to Withdraw Demand for Jury Trial and to Strike Karp's Demand for Jury Trial. (ECF No. 224.)

## IV.   Conclusion

The Court has determined that material questions of fact remain in dispute. Therefore summary judgment is not appropriate.  In conclusion, for the reasons stated above, it is **ordered** that the parties' motions for summary judgment (ECF Nos. 110 & 173) are **denied**. In addition, Defendant's Motion for Leave (ECF No. 111) to File Amended Answer and Affirmative Defenses is **denied**.

Furthermore, Defendant's Objections to the Order of Magistrate Judge Bandstra (ECF No. 210) are **overruled**; Defendant's Motion to Compel (ECF No. 175) is **denied** without prejudice to renew if necessary; and Plaintiff's Motion to Withdraw Jury Demand and to Strike Jury Demand (ECF No. 224) is **granted**. This case will be tried as a bench trial. Defendant's Renewed Request for Oral Argument on the Cross Motions for Summary Judgment and Motion for Leave to File Amended Answer (ECF No. 242) is **denied** as moot.

**Done and ordered** in chambers, at Miami, Florida, on July 30, 2014.

Robert N. Scola, Jr.
United States District Judge